UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

RICHARD J. MARTIN )
)
V. ) NO. 2:07-CV-147
)
MICHAEL J. ASTRUE, )
Commissioner of Social Security )

REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge for a report and recommendation with respect to the administrative denial of the plaintiff's applications for disability insurance benefits and supplemental security income under the Social Security Act. The plaintiff, proceeding *pro se*, has failed to file a dispositive motion despite many orders and reminders from the Court to do so. At the instance of the Court, the defendant Commissioner has filed a Motion for Summary Judgment [Doc. 15]. In deference to the *pro se* status of plaintiff, the Court has reviewed the administrative record, choosing to dispose of the case on the merits, rather than upon purely technical grounds. Accordingly, the Commissioner was ordered to file his Motion for Summary Judgment.

The sole function of this Court in making this review is to determine whether the findings of the Secretary are supported by substantial evidence in the record. *McCormick v. Secretary of Health & Human Services*, 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Comm.*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor

decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Secretary's decision must stand if supported by substantial evidence. *Listenbee v. Secretary of Health and Human Services*, 846 F.2d 345, 349 (6th Cir. 1988).

Plaintiff was 35 years old at the time of the decision of the Administrative Law Judge ["ALJ"]. Plaintiff has a high school education and past relevant work experience as a baker (skilled, heavy work) and general laborer (unskilled, medium work). Plaintiff left his last job with a landscaping company on May 23, 2003, alleging that he was no longer capable of performing the work. The plaintiff alleges disability due to bipolar disorder, mental disabilities, lung problems and cerebral palsy. [Tr. 17]. Plaintiff alleged a disability onset date of May 21, 1995.

The medical evidence is fairly stated by the Commissioner at pages 3 through 11 of his brief [Doc. 16] as follows:[1]

<u>Medical Evidence Prior to May 21, 2003</u>

Plaintiff received mental health treatment at Redbud Community Hospital and First Hospital Vallejo in California on several occasions between June and November of 1992 (Tr. 121-123, 125-221). During this period he reported heavy alcohol use and was tested positive for cannabis (Tr. 123, 136). Plaintiff was diagnosed with acute psychosis on August 22, 1992 (Tr. 122). Plaintiff was diagnosed with major depression on November 24, 1992 (Tr. 126, 130).

Plaintiff was admitted to Redbud Community Hospital on July 25, 1994, complaining of twitching of his body and chest discomfort (Tr. 223). He tested positive for amphetamines and was diagnosed with mild benzodiazepine withdrawal and methamphetamine abuse (Tr. 223).

---

[1] The date of May 21, 2003, is significant because the ALJ's ultimate finding that the plaintiff was not disabled was predicated on different reasons before and after that date.

Plaintiff was admitted to Redbud Community Hospital a final time on October 29, 1994 complaining of uncontrollable shaking in his lower extremities and he was tested positive for amphetamines and THC (Tr. 222). He was diagnosed with leg tremors of unknown etiology and methamphetamine abuse (Tr. 222).

Plaintiff was admitted to Ozarks Medical Center in Missouri on July 27, 1995, claiming suicidal ideation (Tr. 236). Plaintiff reported on July 28, 1995, that his depression began four years prior when he began to abuse alcohol and amphetamines (Tr. 234). However, Plaintiff denied use of alcohol and stimulants during the prior two years, contradicting earlier testing (Tr. 235). Plaintiff was diagnosed with depression (Tr. 235).

Plaintiff was admitted to Lakeway Regional Hospital in Tennessee on April 14, 2003, after hitting his thumb with a mallet while working for Advance Landscape (Tr. 333, 334, 335, 337, 339A, 347-348, 381-382). It was determined that Plaintiff fractured the tip of the distal phalanx in his left thumb (Tr. 340, 343-344, 347-348, 359). Surgery was performed at Morristown Hamblen Hospital, and he was discharged on April 15, 2003 (Tr 341, 342, 343-344, 353-354). Dr. McLemore later advised Plaintiff that he could resume work with both hands on May 23, 2003 (Tr. 378).

<u>Medical Evidence After May 21, 2003</u>

On September 16, 2003, Plaintiff was treated at Bean Station Medical Center in Tennessee for chest discomfort (Tr, 329). He was diagnosed with chronic bronchitis, cough and congestion (Tr. 331). However, the x-ray of Plaintiff revealed no acute infiltration or congestion and no pleural effusion or pneumothorax was observed (Tr. 331).

Plaintiff received mental health treatment at Cherokee Health Systems in Tennessee on February 3, 2004, more than eight years after his last psychiatric examination at the Ozarks Medical Center (Tr. 242-243, 400-407). At his intake examination, Plaintiff reported that he was "manic depressive" and had been diagnosed with bipolar disorder (Tr. 404). The social worker conducting the intake examination noted a diagnosis of bipolar disorder with hypomania,

3

anxiety, difficulty concentrating and tendencies to anger (Tr. 404). Later that day, Plaintiff reported to Dr. Gregg Perry and Nurse Susan Eby that he had never been diagnosed with bipolar disorder (Tr. 400). His chief complaints were anxiety, nervousness in crowds, decreased moods, variable sleep and general fatigue (Tr. 400). Plaintiff reported that he had asthma and tremors with two seizures in 1993 and 1995 of unknown etiology (Tr. 401). He reported past use of methamphetamines and cocaine with current use of cannabis (Tr. 401).

Dr. Perry and Nurse Eby provided a diagnosis of generalized anxiety disorder, cannabis abuse, history of alcohol and substance abuse, rule out mood disorder and malingering (Tr. 402). These impressions were repeated nearly verbatim in a large number of documents generated by Dr. Perry and Nurse Eby between February 3, 2004 and April 14, 2005 (Tr. 397, 398, 399, 402, 448, 454, 455, 458, 464, 467). Dr. Perry and Nurse Eby noted that, although the social worker voiced concerns that Plaintiff was manic and had been provided a diagnosis of bipolar disorder, they saw "a much different picture" (Tr. 403). While being treated at Cherokee Health Systems, Plaintiff was observed on many occasions with a full affect and moods that were reported to variously be cheerful, euthymic or only minimally depressed or anxious (Tr. 397, 398, 399, 402, 454, 467). On two occasions when he reported being "depressed," it was observed that his affect was incongruously "cheerful" or full (Tr. 458, 464). On numerous occasions, staff at Cherokee Health Systems reported that Plaintiff displayed no psychosis or mania (Tr. 397, 398, 399, 402, 447, 454, 455, 458, 464, 467).

Dr. Rebecca Hansmann conducted a psychiatric record review on May 19, 2004 (Tr. 408-424). She noted that Plaintiff had anxiety-related and substance abuse disorders (Tr. 411, 416, 419). Dr. Hansmann opined that Plaintiff could concentrate and persist for simple and detailed tasks despite periods of increased symptoms (Tr. 410). She continued that Plaintiff had some, but not substantial, difficulty dealing effectively with co-workers, supervisors and the public and could adapt to infrequent change (Tr. 410). Dr. Hansmann reported that mild to moderate psychological impairments were indicated (Tr. 423). She believed that the allegations regarding

4

Plaintiff's psychological impairments were only partially credible because some of the reported limitations were not fully supported by the records (Tr. 423).

An examination was performed by Dr. Wayne Page on June 11, 2004 (Tr. 425-434). Plaintiff denied that he engaged in any activity on a typical day, however Dr. Page observed that this was specifically contradicted by the state of Plaintiff's hands, which were soiled and callused suggesting Plaintiff performed manual labor (Tr. 427, 430). Plaintiff claimed to be unable to work because of bronchial asthma and emphysema (Tr. 427). Plaintiff reported to Dr. Page that he had lung problems for the past ten years and had been smoking one and a half packs of cigarettes per day for the past twenty-three years (Tr. 425-426). A pulmonary function test was performed that day with the conclusion that there was no acute pulmonary process (Tr. 431-434). Dr. Page observed that Plaintiff's chest was clear in all respects (Tr. 429). Plaintiff reported that his hands always shook due to cerebral palsy, however Dr. Page observed no tremors and stated that there was no functional inhibition by spasticity, rigidity or pain (Tr. 425, 428). Plaintiff exhibited poor effort or pain behavior on a grip test, which was therefore considered invalid (Tr. 427, 429, 430). Plaintiff denied marijuana use in the past two years despite reporting use on February 3, 2004 (Tr. 401, 426). Dr. Page reported that there were no objective signs of anxiety or depression (Tr. 430). He concluded that Plaintiff could occasionally lift fifty pounds, frequently lift and carry twenty-five pounds and stand, walk and sit for a full eight-hour work day (Tr. 428). Dr. Page stated that Plaintiff had no impairments related to hearing, speaking, vision or traveling (Tr. 428).

Dr. Page observed that when judging the credibility of subjective complaints, the reliability of the examinee is a crucial factor (Tr. 428). He concluded that Plaintiff had no credibility because the results of the spirometry performed that day were not consistent with breathing difficulty; Plaintiff had an invalid grip test; and his reported complete inactivity was contradicted by the appearance of his hands (Tr. 428). Dr. Page stated that Plaintiff's purely subjective complaints should be given no weight in making a determination regarding his

5

capabilities (Tr. 428).

Dr. James Moore conducted another record review on June 18, 2004 (Tr. 435-442). Dr. Moore opined that Plaintiff could occasionally lift fifty pounds, frequently lift twenty-five pounds and was not restricted in his ability to push or pull (Tr. 436). He noted that Plaintiff could stand and walk for six hours in an eight-hour work day and sit for an equivalent amount of time (Tr. 436). Dr. Moore noted that although Plaintiff claimed to suffer from asthma and cerebral palsy, his spirometry was normal, no tremors were observed in his last examination and he displayed no spasticity or rigidity (Tr. 436). He did not indicate any postural, manipulative, visual or communicative limitations (Tr. 437-439). Dr. Moore did note that Plaintiff should avoid concentrated exposure to fumes, odors, dust and gases because he alleged suffering from asthma (Tr. 439).

On August 18, 2004, Plaintiff presented to Dr. Perry and Nurse Eby for a medication check (Tr. 467). Plaintiff reported to them for the first time that he experienced auditory and visual hallucinations (Tr. 467). Plaintiff presented to Dr. Nancy Witherspoon on September 8, 2004, apparently complaining of memory loss and requesting an MRI (Tr. 466). An MRI was performed, and Dr. Witherspoon reported on September 24, 2004, that the results were a normal MRI of the head, although early cerebral atrophy was demonstrated (Tr. 486-487).

On October 11, 2004, Plaintiff complained to Dr. Witherspoon of abdominal pain and coughing (Tr. 462-463). Plaintiff underwent a pulmonary function testing and abdominal ultrasound and x-ray in November of 2004 (Tr. 473-484). All tests were reported as being normal (Tr. 473, 474, 475, 476, 481).

Plaintiff presented to Dr. Perry and Nurse Eby on January 14, 2005, for a medication check (Tr. 455). He acknowledged repeatedly missing psychotherapy appointments and refused an offer for case management services (Tr. 455). Plaintiff was examined by neurologist Dr. Abdelrahman Mohamed on January 12, 2005 (Tr. 492-493). Plaintiff complained of pains in his arms, legs and head and shaking in his hands (Tr. 491). Dr. Mohamed observed no tremor

6

during a finger-nose-finger test, while at rest or when Plaintiff's hand was outstretched (Tr. 492). Dr. Mohamed concluded that the tremors were likely associated with Plaintiff's reported anxiety disorder (Tr. 493). During another medication check by Dr. Perry and Nurse Eby on February 11, 2005, it was observed that Plaintiff's hands were tremulous throughout the interview (Tr. 454). Dr. Perry observed on April 14, 2005 that "[w]e are certainly all over the place with impressions in the past. I would love to see some diagnostic clarity in the near future" (Tr. 448).

Plaintiff was hospitalized during March of 2005 for a seizure and was prescribed Dilantin (Tr. 453). Dr. Mohamed examined Plaintiff again on April 15, 2005, and noted that Plaintiff was being admitted "in increasing frequency to emergency rooms for seizures" (Tr. 489). Dr. Mohamed opined that these were pseudoseizures (Tr. 450, 489). He stated that he suspected that Plaintiff did not have a neurological disorder, but rather his seizures and tremors were psychiatric in origin (Tr. 490).

On May 5, 2005, Plaintiff was admitted to Lakeshore Mental Health Institute in Tennessee (Tr. 497-518). While there, Plaintiff represented that he was depressed, had difficulty concentrating and was experiencing suicidal and homicidal ideations (Tr. 497, 504). He stated that he experienced auditory and visual hallucinations (Tr. 497, 504, 707, 714). Plaintiff reported that he smoked marijuana on a daily basis from age thirteen until six months previously and used crack cocaine heavily for two months about eighteen months previously (Tr. 498, 505, 708, 715). However, he tested positive for THC that day (Tr. 498). During an initial evaluation, a social worker reported that he appeared to by physically healthy and in no acute distress and displayed no psychomotor abnormalities (Tr. 506, 716). Dr. Ittoop Maliyekkel diagnosed Plaintiff with severe bipolar disorder with mixed psychotic features and a history of polysubstance dependancy (Tr. 502, 712). Plaintiff was discharged on May 9, 2005 (Tr. 497, 707).

A psychological examination was performed by Alice Garland on July 28, 2005 (TR. 519-529, 719-729). She reported that Plaintiff was not a very good informant and did not appear

7

to be putting forth good effort in testing (Tr. 520, 720). She estimated his intelligence to be "[b]orderline to low average" (Tr. 520, 720). Ms. Garland observed that Plaintiff had a fine motor tremor of intent initially that quickly abated (Tr. 521, 721). He claimed that he suffered from depression and attempted to commit suicide several times (Tr. 522, 722). Ms. Garland conducted a Structured Interview of Reported Symptoms (SIRS) and a Personality Assessment Inventory (PAI) (Tr. 524, 525). She stated that the results indicated that Plaintiff was feigning and exaggerating symptoms, although she acknowledged that Plaintiff had a long history of psychiatric diagnoses (Tr. 524, 525). Ms. Garland stated that Plaintiff had anger problems and his ability to relate was poor to seriously impaired, depending on the situation (Tr. 522, 722). Plaintiff scored in the mild mental retardation range on intelligence tests, but Ms. Garland stated she believed those to be low scores (Tr. 523, 723). The test of memory malingering suggested that Plaintiff was malingering (Tr. 523, 723). Ms. Garland concluded that she believed Plaintiff was borderline in intelligence, but that the test results were likely a low estimation of his ability (Tr. 525, 725). Ms. Garland stated that Plaintiff had a long history of mental health treatment and it would be unlikely that he would enter the workforce willingly, maintain employment or relate well to co-workers (Tr. 525, 725). She concluded that she would find it difficult to provide a specific diagnosis given the test results (Tr. 525, 725). Ms. Garland completed a Medical Assessment of Ability to Do Work-Related Activities indicated fair or poor functioning in many categories, however she noted multiple levels of severity for many categories (Tr. 527-529, 726-729).

      Plaintiff was admitted to Morristown Hamblen Hospital in Tennessee on December 15, 2005, complaining of depression and suicidal ideation (Tr. 545). He was evaluated by David Bennett who provided his impression that Plaintiff had bipolar disorder with suicidal ideation (Tr. 546, 549, 550). Plaintiff was transferred to Lakeshore Mental Health Institute on December 16, 2005 (Tr. 564). Plaintiff was evaluated by Nurse Beverly Bradshaw who noted that Plaintiff was experiencing increased depression with suicidal ideation (Tr. 580). Plaintiff reported that he

8

had not used illegal drugs or alcohol in three or four years (Tr. 581, 602). Nurse Bradshaw provided the impression that Plaintiff had severe bipolar disorder with psychotic features (Tr. 583). Plaintiff was referred for case management services (Tr. 593, 607). Plaintiff was discharged on December 21, 2005 (Tr. 569, 632). The record does not contain information concerning Plaintiff's alleged impairments after this date.

Dr. Norman Hankins was retained as a vocational expert by the plaintiff's counsel.[2] Dr. Hankins reviewed plaintiff's medical records and work history and concluded that plaintiff had not performed any job in his working life long enough to acquire job skills. He opined that plaintiff could not work on a regular and sustained basis because of his alleged impairments. (Tr. 536, 733).

Dr. Thomas Schacht testified as a medical expert at the administrative hearing. Dr. Schacht noted that plaintiff had been seen multiple times for psychiatric problems, beginning in 1992. He noted that plaintiff was abusing drugs and alcohol during that time period. (Tr. 797). Between 1996 and 2004, Dr. Schacht testified that the record was relatively silent regarding mental health treatment. (Tr. 800). He asserted that clarity in diagnosis would be important for treatment and that such clarity was lacking (807-809).

Dr. Schacht also stated that in his opinion, a diagnosis of bipolar disorder could not be made in the presence of the plaintiff's underlying substance abuse. He noted that the record indicated possible malingering and secondary gain (Tr. 809).

Also at the hearing, the ALJ called Dr. Robert S. Spangler to testify as a vocational expert. He asked Dr. Spangler to assume that the plaintiff had a high school education and

---

[2] The plaintiff, although now *pro se*, was represented by counsel at the administrative level.

average intelligence. He also asked him to assume he was limited to light work and should not be around moving machinery, unprotected heights, and was subject to "seizure precautions." Dr. Spangler identified 8, 922,518 jobs, and 114,000 in the region. This number would be lowered by 30 % factoring in the limitations for seizures. (Tr. 810-11).

In his hearing decision, the ALJ found that the plaintiff had a seizure disorder which was a severe impairment. (Tr. 27). The ALJ found that the plaintiff did not have a significant impairment due to cerebral palsy. (Tr. 24). He found that the plaintiff had no more than a mild mental impairment. (Tr. 23). He found that, prior to May 21, 2003, day the plaintiff last worked, the plaintiff had no period of 12 or more continuous months within which he performed no substantial gainful activity. (Tr. 17). Subsequent to May 21, 2003, the ALJ found, based upon the testimony of Dr. Spangler, that a significant number of jobs existed which the plaintiff could perform. (Tr. 28). Accordingly, the plaintiff was found to be not disabled.

With respect to the plaintiff's physical impairment, and his vocational capabilities, there is substantial evidence in the testimony of Dr. Page. Also, the numerous discrepancies in the plaintiff's statements to his various treating physicians and examiners was legitimate fodder for the ALJ's opinion.[3]

The mental impairment evidence is more troublesome. Although plaintiff gave different stories to different mental health professionals, one must bear in mind that one may not receive Social Security benefits for alcoholism or drug addiction. Thus, the diagnoses

---

[3] An excellent summary of these contradictory statements is found in defendant's Memorandum [Doc. 16], at pages 17 and 18.

10

of depression and bipolar disorder are called into legitimate question. Dr. Page and Dr. Schacht provided substantial evidence, both for the ALJ and for the vocational expert. The ALJ, when all is said and done, did nothing more than find the facts, which is his right so long as there is substantial evidence to support those findings and so long as he does not run afoul of Social Security regulations. Although the plaintiff is at a disadvantage by not having counsel, as best the undersigned can determine from this 818 page record, there is substantial evidence and the regulations were followed.

The ALJ adjudicated this case within the law, and made no findings which were not based on substantial evidence. Accordingly, it is respectfully recommended that the Motion for Summary Judgment [Doc. 15] of the defendant Commissioner, be GRANTED, and the case DISMISSED.[4]

Respectfully submitted:

  s/ Dennis H. Inman
United States Magistrate Judge

---

[4] Any objections to this report and recommendation must be filed within ten (l0) days of its service or further appeal will be waived. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>United States v. Walters</u>, 638 F.2d 947-950 (6th Cir. 198l); 28 U.S.C. § 636(b)(1)(B) and (C).